UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30171
_____


SURGICAL CARE CENTER OF HAMMOND, L.C.,
doing business as St. Luke's Surgicenter,

Plaintiff-Appellant,

versus

HOSPITAL SERVICE DISTRICT NO. 1 OF TANGIPAHOA PARISH,
doing business as North Oaks Medical Center;
QUORUM HEALTH RESOURCES, INC.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

October 9, 2002

Before KING, Chief Judge, JONES and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Surgical Care Center contends that North Oaks Medical Center, a public hospital, has violated the Sherman Antitrust Act and Louisiana statutes governing monopolies and unfair trade practices. The district court conducted a bench trial and entered judgment for North Oaks. We find neither clear error in the fact findings nor any errors of law on the issues tried by the court. Accordingly, the judgment of the district court is AFFIRMED.

## I.   BACKGROUND

Surgical Care Center of Hammond is a limited liability company doing business as St. Luke's Surgicenter, an outpatient surgery clinic that opened in 1996 in Hammond, Louisiana.  The Hospital Service District No. 1 of Tangipahoa Parish is a political subdivision of the State of Louisiana that operates North Oaks Medical Center, the largest hospital in the Hammond area.  North Oaks offers a full range of inpatient and outpatient services, including outpatient surgery.  Quorum Health Resources, Inc. manages the North Oaks facilities.

St. Luke's brought this action against North Oaks and Quorum, alleging that their trade practices violated the Sherman Act, 15 U.S.C. §§ 1-2; the Louisiana Monopolies Act, LA. REV. STAT. ANN. § 51:123; and the Louisiana Unfair Trade Practice and Consumer Protection Act, LA. REV. STAT. ANN. § 51:1405.

St. Luke's contends that North Oaks is attempting to monopolize the outpatient surgery market by exploiting its market power over inpatient care and, more specifically, by pressuring managed care companies to use North Oaks exclusively for both inpatient and outpatient care.[1]  According to St. Luke's, these exclusive agreements and the "tying" of inpatient and outpatient

---

[1]    The "exclusive" contracts entitled HMO's or Preferred Provider organizations (PPO's) to up to a 25% discount of billed charges if the provider designated North Oaks as the sole provider of certain medical services, including outpatient surgery, within a designated geographic area.

care are violations of both federal and state antitrust laws. St. Luke's also alleges that North Oaks refused to sign a patient transfer agreement with St. Luke's, refused to sign a blood type and cross match agreement, refused to lend medical equipment to St. Luke's, and engaged in various unfair employment practices.

After the issue of "state action immunity" was resolved,[2] the district court tried the case and entered judgment for the defendants on all claims. The district court concluded, first, that St. Luke's did not prove attempted monopolization of outpatient surgery under § 2 of the Sherman Act.[3] According to the district court, St. Luke's evidence established neither predatory conduct by North Oaks nor a dangerous probability that North Oaks would achieve monopoly power in the outpatient surgery market. Second, the district court ruled that St. Luke's could not prevail on its conspiracy claim under § 2 of the Sherman Act because North Oaks and Quorum (*qua* principal and agent) are incapable of conspiring with one another to violate antitrust laws. Finally, the district court ruled that North Oaks was entitled to

---

[2]    See Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa Parish, 171 F.3d 231, 232 (5th Cir. 1999)(en banc) (holding that the Louisiana legislature "did not make sufficiently clear an intent . . . to insulate its creature of state government from the constraints of the Sherman Antitrust Act. . . .").

[3]    Section 2 of the Sherman Act makes it unlawful for any person or firm to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

"discretionary act immunity" shielding it from liability under both the Louisiana Monopolies Act and the Louisiana Unfair Trade Practices Act. The district court did not address St. Luke's claims under § 1 of the Sherman Act[4] because, prior to trial, the court ruled that St. Luke's complaint had not included § 1 claims and then denied St. Luke's request to amend its complaint. St. Luke's now appeals.

## II. DISCUSSION

### A. Attempted Monopolization

To prevail on its attempted monopolization claim under § 2, St. Luke's had to prove (1) that North Oaks engaged in predatory or exclusionary conduct with (2) a specific intent to monopolize the relevant outpatient surgery market and (3) a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 890-91, 122 L.Ed.2d 247 (1993). The district court found, first, that the business practices of which St. Luke's complained all had a legitimate business justification and thus could not be deemed predatory or exclusionary under Taylor Publishing Co. v. Jostens, Inc., 216 F.3d 465, 474-76 (5th Cir. 2000). Alternatively, the district court ruled that St. Luke's had not shown a dangerous probability that North Oaks would achieve monopoly power in the

---

[4] Section 1 of the Sherman Act provides that "Every contract . . . or conspiracy, in restraint of trade or commerce among the several states" is illegal. 15 U.S.C. § 1.

outpatient surgery market.  We review legal questions *de novo* but will set aside the district court's findings of fact only if clearly erroneous.  FED. R. CIV. P. 52(a).

We need address only the third element: the probability of achieving monopoly power.  St. Luke's bases its attempted monopolization claim on North Oaks's contracts with managed care providers.  Essentially, if a managed care provider agreed to use North Oaks for outpatient surgical services, then North Oaks would offer substantial discounts on prices for inpatient care.  St. Luke's alleged that North Oaks, by entering into these exclusive agreements, "used or leveraged its dominant market power in the inpatient hospital services market in an attempt to gain similar market power . . . in the outpatient surgical services market." This court has not ruled on monopolistic leveraging as a distinct § 2 offense, and we do not do so here.  See Eleven Line, Inc. v. North Texas State Soccer Assoc., Inc., 213 F.3d 198, 206 n.16 (5th Cir. 2000); 3 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 652 (2d ed. & 2002 Supp.).   But like the district court, we find that St. Luke's claim of monopolistic leveraging fails on its own terms.

The district court noted that any theory of monopolistic leveraging first depends on proof that the defendant possesses market power in a relevant market, power that it then extends into the plaintiff's market.  This inquiry, in turn, requires a clear definition of the relevant geographic market.  See, e.g., Dimmitt

5

_Agri Indus., Inc. v. CPC Int'l, Inc._, 679 F.2d 516 (5th Cir. 1982).

As we have held,

> To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market. . . . Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices. The possibilities for substitution must be considered.

_Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance_, 123 F.3d 301, 311 (5th Cir. 1997)(citations omitted). In a similar case, the Eighth Circuit emphasized that a hospital's "trade area is not necessarily the relevant geographic market for purposes of antitrust analysis" because geographic market evidence must take into account "where consumers could practicably go, not on where they actually go." _Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp._, 208 F.3d 655, 662 (8th Cir. 2000)(internal quotation marks omitted).

Nevertheless, St. Luke's expert did not attempt to identify the hospitals or clinics that may be deemed competitors of North Oaks. He relied solely on what he defined as North Oaks's service area to compose the geographic market. Absent a showing of where people could practicably go for inpatient services, St. Luke's failed to meet its burden of presenting sufficient evidence to define the relevant geographic market. Without a proper market definition, St. Luke's could not establish the predicate of a monopolistic leveraging claim, i.e., market power in the market for

6

inpatient hospital services, and thus could not show a dangerous probability that North Oaks would gain monopoly power in the outpatient surgery market. The district court, after carefully analyzing the reports presented by experts for both St. Luke's and North Oaks, found that St. Luke's had not adduced sufficient evidence to delineate the relevant geographic market.

St. Luke's counters that a detailed analysis of the relevant geographic market is not necessary under <u>Federal Trade Comm'n v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). To prevail on this argument, St. Luke's would have to persuade this court that, even with <u>Indiana Federation</u> is applicable to cases involving vertical restraints, the district court clearly erred when it did not find "actual, sustained adverse effects on competition." <u>Id.</u>, 476 at 461, 106 S.Ct. at 2019. St. Luke's has failed to do this.

We hold that the district court did not err in dismissing St. Luke's claims of attempted monopolization because St. Luke's failed to meet its burden of presenting sufficient evidence to define the geographic market.[5]

---

[5] The district court alternatively ruled that even if one were to accept St. Luke's definition of the outpatient surgery market as limited to North Oaks's service area, St. Luke's still had failed to show a dangerous probability of North Oaks' achieving monopoly power. The district court emphasized that (1) North Oaks' 42-44% share of the outpatient surgery market (as narrowly defined by St. Luke's) was not dominant; (2) St. Luke's expert opined that there are "few if any classic barriers to entry into the ambulatory surgical services market"; (3) St. Luke's obtained 24.7% of the

7

### B. Conspiracy to Monopolize

St. Luke's contends that North Oaks and Quorum (the company that manages North Oaks) conspired to monopolize the outpatient surgical market. See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc. 200 F.3d 307, 316 (5th Cir. 2000)(listing the elements of a conspiracy claim under § 2).

The district court dismissed the conspiracy claim because "as a matter of law, a corporation and its agent [i.e., North Oaks and Quorum] are incapable of conspiring with one another to violate the antitrust laws." This general rule is correct, and none of the recognized exceptions applies to this case. See, e.g., Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1135-37 (3d Cir. 1995).[6] The district court did not err in dismissing St. Luke's conspiracy claim under § 2 of the Sherman Act.

### C. Tying and Exclusive Contracts

St. Luke's alleged in its complaint that North Oaks had illegally "tied" its outpatient services to inpatient services by

---

outpatient surgery market in its first full year of operations, even though North Oaks already had entered into exclusive agreements with several managed care companies; and (4) St. Luke's expert admitted that North Oaks would have only a "very limited ability" to raise prices above the competitive level if St. Luke's went out of business.

[6] St. Luke's appears to concede this point in its brief, noting that the rule articulated by the district court "generally applies to St. Luke's Sherman Act claims . . . [but] has no application to St. Luke's allegations based on Louisiana's monopoly laws." The state law claims will be discussed below.

entering into exclusive dealing contracts with managed care providers, in violation of both § 1 and § 2 of the Sherman Act.

Nevertheless, not long before the trial began, the district court indicated that the only issues properly presented in the complaint were St. Luke's Sherman Act § 2 and state law claims. St. Luke's disagreed with the court's characterization of the complaint and sought to amend the complaint. The district court denied St. Luke's motion and wrote that the proposed amendment "was more than a mere attempt to *clarify* the original and First Amended Complaints. Rather, it was clearly *adding* a Section 1 Sherman Act claim, and thus expanding the nature of the case." Although the question whether to grant leave to amend a complaint is reviewed for an abuse of discretion, a district court "must have a 'substantial reason' to deny a request for leave to amend." <u>Lyn-Lea Travel Corp. v. American Airlines</u>, 283 F.3d 282, 286 (5th Cir. 2002). Because the factual allegations supporting the § 1 claims were described in the complaint and, furthermore, the complaint specifically referred to § 1 of the Sherman Act, the district court abused its discretion in not allowing St. Luke's to amend its complaint.

The question that next arises is whether to remand the case for a trial on the § 1 claims.[7] We conclude that remand is

_____

[7] St. Luke's argued in its brief to this court that remand was unnecessary because the record contained ample evidence of a § 1 violation. St. Luke's suggested that remand would be appropriate

9

unwarranted. Even if St. Luke's had been allowed to amend its complaint, St. Luke's could not have prevailed because its § 1 claims share certain elements with the § 2 claims, and St. Luke's failed to present evidence as to those common elements.

To show that North Oaks's tying of inpatient care to outpatient surgical care violates § 1 of the Sherman Act, St. Luke's must prove that (1) North Oaks has "appreciable economic power" in the market for inpatient care (the tying market), and (2) the tying arrangement "affects a substantial volume of commerce" in the market for outpatient surgical care (the tied market). Eastman Kodak Co. v. Image Technical Serv., Inc., 504 U.S. 451, 461-62, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992). Consequently, "any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 18, 104 S.Ct. 1551, 1561, 80 L.Ed.2d 2 (1984). We need not remand the case for consideration of the tying claims because St. Luke's failure sufficiently to define the relevant geographic market for the tying

---

only if evidence as to any element of a § 1 violation was not allowed or was otherwise not presented at trial. At oral argument, though, St. Luke's counsel requested remand and stated that relevant § 1 evidence was either not presented or not admitted at trial. We will not permit an off-the-cuff statement to contradict the considered admission in St. Luke's brief.

10

product -- inpatient services -- also proves fatal to its tying claim under § 1.

The exclusive dealing allegations fail for the same reason. To show that North Oaks's contracts with managed care companies constitute an unreasonable restraint on trade in violation of § 1, St. Luke's had to prove that North Oaks engaged in concerted action that produced anticompetitive effects *in the relevant markets*, yet the market power of North Oaks in the tying market for inpatient health care simply was not established. See Stewart Glass, 200 F.3d at 312.

In sum, the district court's error in not allowing St. Luke's § 1 claims to be tried was harmless in light of St. Luke's failure properly to define the relevant market, and thereby prove North Oaks's market power.

## D. Louisiana Law

The district court dismissed St. Luke's claims under both the Louisiana Monopolies Act and the Louisiana Unfair Trade Practices Act on the grounds that North Oaks, as part of a state-created hospital district, is entitled to "discretionary act immunity": "Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance of . . . their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." LA. REV. STAT. ANN. § 9:2798.1(B). Because Louisiana hospital

11

districts have the legal authority to enter into contracts to sell hospital health services, and because St. Luke's state-law claims were based on those acts, the district court ruled that North Oaks and its agent Quorum are entitled to immunity under state law.

St. Luke's points out, however, that public entities are not entitled to discretionary act immunity when the challenged acts "are not reasonably related to a governmental objective for which the policy-making or discretionary power exists." LA. REV. STAT. ANN. § 9:2798.1(C)(1). The legislature's objectives in conferring authority on the hospital districts were, in the district court's words, to allow hospital districts "to compete effectively and equally in the market for health care services" and to cooperate with other firms to provide health care services to residents of the district. North Oak's business practices, according to St. Luke's, are not reasonably related to either of these objectives.

We need not reach the question of discretionary act immunity because St. Luke's state law claims necessarily fail for other reasons.

The Louisiana Monopolies Act provides that "No person shall monopolize, or attempt to monopolize, or combine with any other person to monopolize any part of the trade or commerce within this state." LA. REV. STAT. ANN. § 51:123. Assuming *arguendo* that the Louisiana Monopolies Act applies to cases involving interstate

12

commerce,[8] St. Luke's claims under the Louisiana Monopolies Act fail for the same reasons as its claims under § 2 of the Sherman Act. Specifically, St. Luke's could not show attempted monopolization because it failed to define the relevant geographic market and, moreover, the district court did not err in finding no evidence of predatory conduct or of entry barriers. St. Luke's could not prevail on its state law conspiracy claim because the failure to define the market precludes any finding of a substantial, anticompetitive effect in the relevant market.

We turn now to St. Luke's claims under the Louisiana Unfair Trade Practices Act (LUTPA), which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. ANN. § 51:1405. A business practice is considered "unfair" if it offends established public policy and is unethical, oppressive, unscrupulous, or substantially injurious. Jefferson v. Chevron U.S.A. Inc., 713 So.2d 785, 792-93 (La. 1998). A business practice is "deceptive" for purposes of LUTPA when it amounts to fraud, deceit or misrepresentation. Id.

---

[8] The parties agree that this case involves interstate commerce, and there is a plausible argument that the Louisiana Monopolies Act applies only to wholly intrastate restraints on trade. Terrebonne Homecare, Inc. v. SMA Health Plan, Inc., 271 F.3d 186, 189 (5th Cir. 2001)(noting that the question is unresolved); Free v. Abbott Labs., Inc., 164 F.3d 270, 276 (5th Cir. 1999)(certifying question to Louisiana Supreme Court), certified question denied by, 739 So.2d 216 (La. 1999).

As this court has pointed out, LUTPA does not prohibit "the exercise of permissible business judgment." Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir. 1993)("The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious."). In this case, the district court found (when analyzing the "predatory conduct" element of the conspiracy claim) that each of the complained-of acts had a permissible business justification. St. Luke's has not articulated why the district court's findings were clearly erroneous.

### III. CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in dismissing the plaintiff's antitrust claims. The judgment is

**AFFIRMED.**

14